Joseph N. Neel v. Commissioner. Roland H. Neel and Evelyn J. Neel v. Commissioner. Joseph N. Neel and Blanche H. Neel v. Commissioner. Jos. N. Neel Co. v. Commissioner.
Neel v. Commissioner
Docket Nos. 23734, 23735, 23736, 24927.
United States Tax Court
1951 Tax Ct. Memo LEXIS 278; 10 T.C.M. (CCH) 323; T.C.M. (RIA) 51098; March 30, 1951
*278 David I. Shivitz, Esq., Edmund B. Hennefeld, Esq., and Samuel C. Cutler, C.P.A., 331 Madison Ave., New York 17, N. Y., for the petitioners. Ellyne E. Strickland, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: The respondent determined deficiencies against the petitioners as follows: Docket No.
Petitioner
Year
23734
Joseph N. Neel
1943
23735
Roland H. Neel and
1945
Evelyn J. Neel
1946
23736
Joseph N. Neel and
1944
Blanche H. Neel
1945
1946
24927
Jos. N. Neel Co.
Fiscal year ended 1/31/45
Fiscal year ended 1/31/46
Declared Value
Excess
Excess Profits
Income Tax
Profits Tax
Tax
$ 2,840.86
19,974.22
14,088.81
2,257.70
37,748.94
30,059.35
$2,171.58
$85,082.09
5,031.84
7,529.83
76,235.90
Not all of these amounts are in controversy. The issues joined upon petitioners' assignments of error in these proceedings are these: A. As to petitioner corporation, Jos. N. Neel Co.: I. Is the petitioner entitled to deductions from gross income for the fiscal years ended January 31, 1945 and January 31, 1946 in the respective sums of $103,606.80 and $75,429.07 claimed to represent additional compensation paid in these years to its officers and employees for services rendered in prior years? II. Is the *279 petitioner entitled to the deduction of $5,000 claimed in each of the fiscal years for additional accountant's fees alleged to have accrued? III. Is the petitioner entitled to the full deduction in the year ending January 31, 1946, of $30,000 paid to a profit-sharing trust instead of $13,487.88 allowed by the respondent? B. As to petitioners Joseph N. Neel and Blanche H. Neel: IV. Are the petitioners entitled to the benefit of section 107 of the Code for payments received by petitioner Joseph N. Neel in the calendar years 1945 and 1946 claimed to be attributable to services rendered in the respective four-year periods ended January 31, 1936 and January 31, 1940? V. Did the respondent err in computing the depreciation allowed in 1943 and 1945, inclusive, on certain buildings owned by petitioner, Joseph N. Neel? VI. Was the loss petitioners sustained on the sale of certain real property in 1944 an ordinary or capital loss? VII. Did the petitioners realize longterm capital gain on the sale in 1944 of 50 shares of Jos. N. Neel Co. stock? VIII. Did the respondent err in his determination of gain realized by the petitioners in 1946 on the sale of 146 shares of Jos. N. Neel Co. stock? IX. *280 What gain, if any, was realized by petitioners on the redemption of debenture bonds of the Jos. N. Neel Co.? X. What should the petitioners have been allowed as a capital loss carry-over deduction in 1945? XI. If the alleged additional compensation paid Joseph N. Neel in 1945 and 1946 by the Jos. N. Neel Co. is held to be a distribution by the corporation, are the petitioners entitled to the benefit of section 115 of the Code, on the ground that the distribution was at least in part from capital? C. As to petitioners, Roland H. and Evelyn J. Neel: XII. Are the petitioners entitled to the benefits of section 107 of the Code in the manner outlined in question B IV above with respect to additional payments Roland H. Neel received from the Jos. N. Neel Co. in 1945 and 1946? XIII. Are petitioners entitled to apply section 115 under B XI above? XIV. Did the respondent err in disallowing a deduction of $900 claimed by petitioners in 1946 for travel and entertainment expenses? Findings of Fact The petitioner, Jos. N. Neel Co., was incorporated in 1906 under the laws of Georgia and has its principal place of business in Macon, Georgia. Petitioners, Joseph N. and Blanche H. Neel, and Roland *281 H. and Evelyn J. Neel, are individuals with residence in Macon, Georgia. The tax returns of these petitioners for all years involved in these proceedings were filed with the collector of internal revenue for the district of Georgia. The petitioner. Jos. N. Neel Co., reported its income on an accrual basis using a fiscal year ended January 31. The individual petitioners filed their returns each calendar year using the cash basis for reporting income. Joseph N. Neel is an old, respected resident of Macon, Georgia. He has long been in the business of the retail sale of men's clothing and furnishings, beginning as early as 1886 with the firm of Eads and Neel. In 1906 this firm was succeeded by the petitioner corporation, Jos. N. Neel Co., with Joseph N. Neel serving as president. Joseph N. Neel was the first merchant in Macon to establish a "one price" policy in the clothing line. Prior to that time it had been the custom to haggle over the price of each article of merchandise. The clothing carried for sale was of the highest quality and in time the Jos. N. Neel Co. became established as a recognized source for the purchase of clothing. Joseph N. Neel became a leader in the community. Petitioner *282 Roland H. Neel, Joseph N. Neel's son, began to work in the store at the age of 10. He has been continually employed there since he graduated from college in 1914, except for a period of approximately two years during the first World War, during which time he was in the armed services. Sometime in the 1920's after Roland was discharged from service he and his father, Joseph N. Neel, established another retail store known as the "XV Clothing Shop." It carried a low-priced line of men's clothing and featured suits which sold for $15. This second store was located in a building down the street from the original site of Jos. N. Neel Co., but in December, 1930, the petitioner corporation moved into a larger store immediately adjacent to the XV Clothing Shop. In those years the business of the XV Store approximated 10 per cent of the business of the petitioner corporation. During this period both Joseph N. Neel and his son, Roland Neel, devoted a portion of their time and attention to the XV Clothing Shop. In addition to the above-mentioned duties Joseph N. Neel was, about this time, also chairman of the Board of the Fourth National Bank, receiving compensation for his services of $3,600 *283 per annum. The depression of the thirties hit the town of Macon hard. Petitioners Roland and Joseph N. Neel curtailed sharply their salaries and those of the employees in an effort to reduce expenses and save their business. There was no accrual on the books of petitioner corporation of salaries beyond those paid. To have done so would have impaired the company's credit. Some of the Jos. N. Neel Co. personnel were discharged and those who left on their own accord were not replaced. Their duties were assumed by the two Neels and the remaining employees. Realizing that the depression was likely to last for some time and that it would be necessary to work hard in the Jos. N. Neel Co. store to save the business, Roland H. Neel and Joseph N. Neel discontinued entirely their outside activity, including their XV clothing store duties, and devoted all their attention to the petitioner corporation. Joseph N. Neel's duties consisted of making financial arrangements and determining policy. By reason of his personal standing in the city he was able to establish a line of credit on furnishing his personal statement. He was enabled thereby to pay off outstanding indebtedness of the Jos. N. Neel *284 Co. which had become due, and also to meet other current obligations of the corporation. Roland H. Neel was general manager of the store and, in addition to buying all of the clothing and furnishings, he acted as advertising manager, supervised sales from the floor, and spent considerable time at nights and on Sundays keeping his records accurate. Business conditions began to improve in the middle 1930's and salaries and wages of both officers and employees were gradually restored. The following schedule lists the dates some of the officers and employees of the Jos. N. Neel Co. began working for that company, as well as the salary received by them for the years ending January 31, 1930 to January 31, 1946, inclusive. Name
Jos. N. Neel
Roland Neel
C. D. McCowen
H. W. Bronson
Date of Service
Feb., 1906
7-1-14
2-1-06
2-1-06
Jan. 31, 1930
$11,509.92
$ 7,450.08
$3,670.00
$2,149.92
1931
7,834.16
4,200.00
3,000.00
1,950.00
1932
4,800.00
3,275.00
2,065.00
1,800.00
1933
3,000.00
1,800.00
1,350.00
$1,350.00
1934
2,400.00
1,800.00
1,524.96
1,524.96
1935
2,400.00
1,800.00
1,849.92
1,849.92
1936
2,400.00
1,800.00
1,849.92
1,849.92
1937
2,400.00
3,362.50
2,138.46
1,988.46
1938
7,300.00
5,213.15
2,600.00
2,083.00
1939
4,101.00
3,865.95
2,172.00
1,956.85
1940
4,176.00
3,939.75
2,568.75
2,001.90
1941
10,000.00
6,900.00
3,000.00
2,300.00
1942
13,755.03
9,029.50
3,735.00
2,814.00
1943
15,438.38
10,164.25
4,235.00
3,227.00
1944
15,438.35
10,166.50
4,860.00
4,025.12
1945
15,438.35
10,166.50
5,010.00
4,293.02
1946
19,888.29
15,137.50
6,810.00
5,668.42
*285 Name
M. R. Dixon
W. P. Mahone
W. F. Houser
Fannie Barton
Date of Service
1920
11-15-29
No date given
1-9-09
Jan. 31, 1930
$3,199.92
$4,887.42
1931
3,000.00
$1,800.00
3,714.16
1932
2,250.00
1,800.00
2,700.00
$ 990.00
1933
1,863.45
1,425.00
1,650.00
990.00
1934
*** 687.86
1,558.30
1,645.80
870.00
1935
1,734.39
1,849.92
1,849.92
900.00
1936
1,980.43
1,849.92
1,849.92
900.00
1937
2,324.18
1,888.46
1,888.46
918.75
1938
3,275.71
2,100.00
3,017.00
1,020.00
1939
2,975.00
2,100.00
2,243.15
1,020.00
1940
3,512.15
2,143.75
2,289.50
1,041.25
1941
4,000.00
2,503.90
* 3,900.00
1,125.00
1942
** 554.88
3,500.00
5,093.25
1,470.00
1943
** 300.00
4,075.00
1,952.50
1944
** 300.00
4,825.00
2,217.50
1945
** 200.00
4,950.00
2,387.50
1946
** 400.00
6,900.00
3,395.00
Name
Nellie Reinhart
J. V. Sheridan
A. N. Hummel
W. M. Giles
Date of Service
March, 1926
2-19-23
9-1-24
6-30-35
Jan. 31, 1930
1931
1932
$ 420.00
$2,400.00
$1,310.00
1933
660.00
1,800.00
1,086.70
1934
660.00
1,728.72
1,411.70
1935
660.00
1,728.72
1,474.72
1936
660.00
1,614.36
1,400.92
* $ 991.07
1937
636.00
2,100.00
1,521.01
1,662.85
1938
750.00
2,100.00
1,910.08
1,868.10
1939
750.00
2,100.00
1,754.92
1,751.04
1940
765.63
1,093.75
1,900.12
1,894.52
1941
890.24
2,353.76
1,964.06
2,182.48
1942
1,259.95
3,059.76
2,680.21
3,093.71
1943
1,695.00
3,788.40
3,591.09
4,577.75
1944
1,960.00
4,215.83
4,078.93
4,745.98
1945
2,130.00
4,370.35
3,831.63
4,806.78
1946
3,080.00
6,250.96
4,830.60
5,985.24
*286 Joseph N. Neel's health began to break in early 1940 at which time he was 82 years old. In order to allow Joseph to take a less active part in the business, the job of chairman of the board of Jos. N. Neel Co. was created for him and Roland Neel was elevated to the presidency of the company. By 1944, in view of the improved business condition of the store, Roland Neel began considering a profit-sharing plan. A New York tax adviser was consulted, at which time discussion arose concerning additional awards to employees. There had been no prior discussion of such a plan. The tax consultant was informed of the general conditions of the store's business, and directed to formulate plans to put into effect these two ideas. The tax adviser was also retained to assume the accounting and tax duties of the Jos. N. Neel Co., for which total services he was to be paid at the rate of $10,000 a year, $5,000 in cash at the end of the year and the remaining $5,000 "when the case was finally decided." This retainer arrangement was first entered into for the petitioner corporation's fiscal year ended January 31, 1945, and was renewed for the following year *287 on the same terms. In September, 1944, the tax expert journeyed to Macon, Georgia to work out a schedule incorporating the plans for awards as had been requested by Roland Neel. A preliminary and final schedule was completed and submitted, the final schedule bearing the date of January 31, 1945. Roland Neel, in his capacity as president of the Jos. N. Neel Co., submitted the completed schedule to the other officers and to the board of directors of petitioner corporation for their consideration. As a result of the conference with the officers and board the schedule was found satisfactory. In September, 1944, in his capacity as president and as empowered by the by-laws of petitioner corporation with "full, absolute, and complete control and management of all business affairs of the corporation" he instructed the tax adviser to go ahead and put the plan into effect. Due to illness the tax adviser was unable to go forward with work to implement and effectuate this plan during the fiscal year ended January 31, 1945. He did return to Macon, however, in May, 1945 and met with the board of directors of petitioner corporation in regard to fulfilling this duty. At a meeting of the board held *288 on May 7, 1945, the following action was taken. "Mr. Roland H. Neel presented Mr. Samuel C. Cutler, a Tax Expert from New York. "Mr. Roland H. Neel then expressed his appreciation for the loyal and faithful services rendered by the old employees and in view of the recent successful operations of the Company it was his desire to reimburse these employees to some extent for the cuts in salaries which they so willingly took during the lean years which the firm experienced in the 1930s. He then explained that he had Mr. Cutler determine the amounts of these cuts, which Mr. Cutler did and presented to the Board. It was Mr. Neel's desire that the amounts of back salaries as shown on this schedule be paid to the individuals. "Mr. C. D. McCowen made the following motion: 'That the officers be authorized to make these payments and that the schedule be spread upon the minutes of the Board of Directors.' This motion was seconded by Mr. H. W. Bronson and was duly adopted. "Schedule of Back Salaries:
Jos. N. Neel
$ 51,553.52
Roland H. Neel
33,466.00
C. D. McCowen
5,405.20
H. W. Bronson
2,144.55
M. R. Dixon
2,066.85
W. P. Mahone
1,889.56
W. F. Houser
1,826.96
Miss Fannie Barton
1,040.00
Miss Nellie Reinhart
960.00
J. V. Sheridan
1,228.20
A. N. Hummel
1,025.96
W. M. Giles
1,000.00
$103,606.80"
*289 The awards adopted and authorized by the above board action are identical to those contained in the final schedule prepared by the tax adviser in September, 1944. These awards were purportedly in payment for services rendered by the enumerated parties for a period of four consecutive years beginning with the year ending January 31, 1933, and continuing to the year ending January 31, 1936, inclusive. During the fiscal year ended January 31, 1946, the tax adviser was again consulted in regard to formulating awards for certain employees for the next consecutive four-year period January 31, 1936, to January 31, 1940. A schedule listing awards totaling $75,429.07 was prepared in January, 1946 similar to the one submitted to Roland Neel in the previous year. On February 8, 1946, after the end of the fiscal year, the board of directors of petitioner corporation authorized payments of awards for the years 1937 to 1940, inclusive. The following extract is taken from the minutes of a meeting of the board held on that date. "Upon motion made by C. D. McCowen, and seconded by J. N. Neel: "The Officers were authorized to make payments of back salaries as per the following schedule for years 1937-1940. *290 Jos. N. Neel
$44,423.00
Roland H. Neel
24,284.63
C. D. McCowen
2,520.79
H. W. Bronson
569.49
W. P. Mahone
2,342.79
Miss Fannie Barton
800.00
Miss Nellie Reinhart
488.37
$75,429.07"
Seven checks dated January 23, 1946, were issued in payment of the amounts shown in the schedule set out in the preceding paragraph, all of which checks were paid on January 31, 1946. At all times, the two Neels, father and son, owned a controlling interest in the stock issued by the petitioner corporation. Beginning in 1940 and continuing throughout the years here in issue, Joseph and Roland Neel served as chairman of the Board and president, respectively, of the Jos. N. Neel Co. In 1945 and 1946 W. P. Mahone served as secretary and treasurer, and in 1946 C. D. McCowen was elected vice-president of the company. These above listed officers also were directors of the company, in which capacity they were joined by H. W. Bronson and M. R. Dixon. By stipulation accepted by the Commissioner of Internal Revenue on January 27, 1947, the petitioner corporation agreed that awards voted May 7, 1945 to Joseph and Roland Neel, C. D. McCowen and W. P. Mahone were in contravention of the Salary Stabilization Act and would be disallowed *291 in calculating deductions under the revenue laws to the extent of $15,000 for the fiscal year ended January 31, 1945. By like stipulation it was also agreed that $1,200 of the wages paid to employees for that fiscal year would similarly be disallowed as a deduction. The petitioner corporation deducted from its gross income for the years ending January 31, 1945 and 1946, as back-pay awards, the respective sums of $103,606.80 and $75,429.07. These entire amounts were rejected by the respondent on the grounds of improper accrual in both years, that they did not represent ordinary and necessary expenditures, and as to the payment made for the year ending January 31, 1945, that it violated the Salary Stabilization Act of October 2, 1942. Joseph was paid his allocated portion of the awards, $51,553.52 in 1945 and $44,423 in 1946. Roland likewise, in accordance with the schedule, was paid $33,466 in 1945 and $24,284.63 in 1946. In their joint returns filed for these respective years they applied section 107 of the Code in computing the tax owing on their awards. The respondent redetermined their income in each year, denied them the benefit of section 107 and subjected the payments to the *292 then prevailing tax rates on ordinary income. On December 28, 1945, the petitioner corporation entered into an agreement with the Citizens and Southern National Bank, as trustee, for the creation of a profit-sharing trust for the benefit of the company's employees. Article 3 of the trust agreement, headed "Contributions to the Trustee" provided, in paragraph 1, that simultaneously with the execution of the agreement the Company was to pay to the Trustee as its initial contribution to the trust the sum of $15,000. Paragraph 2 of Article 3, as amended January 27, 1948, by agreement retroactively effective as of the date of original execution, reads as follows: "2. Subject to the Company's rights under Article 7 hereafter [pertaining to amendment and termination of the agreement] the Company shall make in each year hereafter, within sixty days next following the close of its taxable year, a contribution of all of its net income in excess of $25,000 for such taxable year, such contribution not to exceed, however, 15% of the aggregate compensation of all participants during such taxable year, or the sum of $15,000, whichever is the lesser of the two amounts. Net income shall mean the net *293 profits as determined in accordance with good accounting principles and after all taxes paid or accrued for the year shall have been set up. The opinion of the Board of Directors and the annual report approved by the Board of Directors shall be absolute and binding for this purpose." On April 19, 1948, the trust agreement was further amended retroactively, as in the previous case, to the date of original execution. The amending agreement, in part, reads as follows: "Whereas, the Commissioner of Internal Revenue has ruled that it is necessary for the Company to provide by amendment that "Back Pay Awards" paid to employees during the taxable years ended January 31, 1945, and 1946, be excluded in computing the compensation upon which will be based the allocation of annual contributions, and, further, that such amendment be made retroactive to the inception of the plan; "NOW, THEREFORE, this agreement witnesseseth; "1. The said agreement of December 28, 1945, as amended by said agreement of January 27, 1948, is further amended in Art. 4, par. 2, by adding at the end, the following: "'Back Pay Awards' paid to any and all employees during the taxable years ended January 31, 1945, and January *294 31, 1946, shall be excluded in computing compensation upon which will be based the allocation of annual contributions for any and all purposes hereunder." Article 4 of the agreement, amended as noted above, is headed "Participation" and is descriptive of the manner in which assets contributed by the petitioner corporation to the trust and profits thereon shall be allocated to the participants within the plan. Two contributions, each in the sum of $15,000 were made by the petitioner corporation to the profit-sharing trust on December 28, 1945 and January 31, 1946, respectively. By letter dated May 18, 1948, the Commissioner advised the petitioner corporation that the trust agreement, as amended, met the requirements of section 165(a) of the Code and that contributions made to the trust would be deductible in accordance with section 23(p). The entire $30,000 was deducted by the petitioner corporation in the fiscal year ended January 31, 1946. The respondent allowed $13,487.88 of this $30,000 as a deduction. Petitioner Joseph N. Neel in his separate return filed for 1943 claimed a $2,100 total depreciation deduction which included consideration of the following properties: Joseph N. Neel *295 Co. store building, XV Clothes Shop building and the K. & L. building. The respondent allowed $128.71 of the amount claimed, which determination is explained in the depreciation schedule attached to the deficiency notice as follows: Allowable
Remaining
Depreciation,
Date Bought
Cost
Basis 1-1-42
1943
Jos. N. Neel Store
Land
6-12-19
$34,767.70
$34,767.70
Bldg.
6-12-19
37,350.00
None
XV Clothes Shop
Land
1-13-16
6,960.00
6,960.00
Bldg.
1-13-16
7,540.00
None
K. & L. Building
Land
8- 5-25
5,500.00
5,500.00
Bldg.
12- 1-32
4,311.35
3,861.35
$128.71
Petitioner Joseph N. Neel filed joint returns with his wife, Blanche H. Neel, for the years 1944 and 1945. The respondent allowed $128.71 of $2,100 claimed as depreciation in 1944, this allowance being similar to that for 1943. In 1945, of $812.50 petitioner claimed as depreciation, $42.90 was allowed. In a statement attached to the deficiency notice for that year the respondent explained the determination as follows: "(c) In arriving at adjusted gross income of $81,600.83, shown under item 5, page 17 your return, depreciation of $812.50 on rental properties was considered and used to offset rental income. However, in bringing forward adjusted gross income to the tax computation, *296 shown on page 3 of your return, the amount of $812.50 was added back to taxable income and an adjusted gross income of $82,413.33 was shown therein. Therefore, since no depreciation was claimed in arriving at your net income of $79,535.74, shown as item 3 of the tax computation, you have been allowed a deduction of $42.90 as computed in Exhibit A." The deduction of $42.50 was explained in the accompanying schedule as allowable depreciation on the K. & L. building for "4/12 of 1945." The petitioner Joseph N. Neel sold in 1944 real property located at 459 Third Street in Macon, Georgia, which had been acquired in 1925 and subsequently devoted to rental purposes. In his joint return filed for 1944 he claimed a deduction of $1,351.40 as an ordinary loss resulting from the sale. The respondent treated it as a long-term capital loss of which $675.70 was allowed as an offset to long-term capital gain. In 1944 and 1946 petitioner Joseph N. Neel sold 50 shares and 146 shares, respectively, of the common stock of Jos. N. Neel Co. The sales price for the 50 shares was $5,000, and $21,900 was received for the 146 shares. These transfers were recorded on the company books under a general account *297 headed, "Record of Corp. Stock," with corresponding entries made in Joseph N. Neel's individual account. Of the 146 shares transferred 145 were received originally as part of a stock dividend declared February 15, 1926. The sale of these shares and the basis attributed thereto is recorded in Joseph N. Neel's individual stock transactions account as follows: Using F.I.F.O.
Book Value
Method for basis of stock
1/ 7/36 Phsed.
100
10,000.00
7/ 8/44 Sold
50
3,474.17
2/15/16 Sold
1
69.48
145
10,075.09
The record of Jos. N. Neel Co., entitled "Record of Corp. Stock" contains the following: 48
1/7/36
J. N. Neel
100 7/8/44 #55-
50 Shs., #56-
50 Shs. 1944
55
7/8/44
J. N. Neel
50
56
R. H. Neel
50
The petitioner Joseph and his wife reported no gain on the first sale of 50 shares but reported a long-term gain of $3,619.17 on the last sale. Petitioner's report of gain on the latter sale had the effect of attributing to the 146 shares a total basis of $14,661.66 or about $100.42 per share. The respondent determined that petitioners realized gain on both transactions, used a March 1, 1913 value of $67.84 per share as basis; and determined that they had additional long-term gains of $804 for 1944 and $2,378.51 for 1946. Petitioner's *298 basis for the two blocks of stock was $69.49 per share. In their joint return for 1945 Joseph N. Neel and wife claimed a $1,000 capital loss carry-over deduction. The respondent allowed only $334.13. He explained this determination as follows: "The deduction of $1,000.00 claimed in your return for a capital loss carry-over has been reduced to $334.13, computed as follows: Unused net capital loss - year 1943
$3,246.23
Allowed as carry-over in 1944
2,912.10
Balance allowable in this year
$ 334.13"
In 1946 petitioner Joseph N. Neel received $10,000 on redemption by Joseph N. Neel Investment Corporation of 10 bonds in face amount of $1,000. Petitioners reported no gain on their joint return. Using a basis of $1,258.72 per bond, the respondent determined that $8,741.28 gain was realized of which 50 per cent was added to taxable income. In 1946 petitioners Roland H. and Evelyn J. Neel claimed $900 as a deduction from income for traveling and entertainment expenses. Records offered to substantiate this claimed deduction consist of 32 checks and check stubs in amounts totaling $972.16. Ten checks in a total amount of $652.33 comprising about 67 per cent of the total expenditures, were expended *299 for whiskey. There were 12 checks in amounts totaling $154.58 expended for jewelry store items, some of which were designated wedding gifts. One check for $29.25 was in payment of interest on a note, another for $18 in payment of third-quarter dues at the Idle Hour Club. Seven checks in total amount of $68 were expended for flowers. The last check was drawn to the order of the Hotel Astor, New York City, for $50. No purpose for the amount drawn was shown. The respondent disallowed this deduction for lack of substantiation of the claimed expenditure and lack of evidence disclosing that the expenditure constituted a proper deduction. Petitioner's expenditures for traveling and entertainment expense during 1946 totaled $600. The books of the Jos. N. Neel Co. show capital account as of March 1, 1913, of $25,000, a surplus as of February 1, 1913, in the amount of $42,835.80, and profits for the month of February, 1913, of $1,651.37, making a total book value as of March 1, 1913 of $69,487.17 for 250 shares of stock, and a book value per share of $69.49 as of that date, March 1, 1913, after giving effect to stock dividends issued. On December 4, 1913, and December 10, 1913, Joseph N. Neel *300 bought seven shares and five shares, respectively, at a cost which, giving effect to stock dividends, would be $58.33 per share. The net earned surplus of the petitioner corporation as of February 1, 1944, which was earned subsequent to March 1, 1913, as shown by the corporation's books, amounted to $85,566.87. Opinion The fourteen issues on which the parties are in controversy will be numbered in the order employed in the introductory statement, but are being dealt with as nearly as possible according to their relationship with each other. I. Petitioners' claim to deductions for so-called back pay to its officers and employees for services rendered in the four-year periods, 1932 to 1936, and 1937 to 1940, must be disapproved. These were years when admittedly the business of the employing corporation was poor and its income inadequate to pay the generous sums subsequently voted. It is true that such a situation often in itself requires more arduous work than when conditions are prosperous. But the success of an enterprise and its ability to pay are large factors in determining compensation. "* * * the corporation must first earn their salaries before they can be paid. * * *." . *301 Much more than is shown is needed to convince us that the salaries voted as much as twelve years later would have been reasonable compensation for the services actually rendered in the earlier years, if paid either in those years or in the period before us. The record does not contain detailed evidence as to the value which any of the non-stockholder employees would have had to another similar business or the amount which petitioner would have had to pay to secure similar services from others than the employees in question. . There is no showing that, with a sizeable surplus, the corporation ever paid dividends. We cannot overlook the lack of arms-length relationships in that almost all of the payments were to be received by stockholders, directors or officers of the employer, and that by far the greatest proportion would enure to the benefit of the stockholders themselves. As to the latter, the payments in question have more of the quality of a dividend, , and as to the employees, of a gratuity or gift as to which no obligation existed. This is not a situation where the salaries were voted contemporaneously *302 and only the payment postponed because of inadequacy of funds. See ; cf. Clark v. Woodward Construction Co. (CCA-10) . It is true that petitioner produced witnesses who gave their opinion on this matter, but without the basic information which the record lacks, these unsupported conclusions do not give a basis for the judgment which is required to determine that the deductions claimed were reasonable. . The question of the fiscal year in which the deductions would be taken thus becomes moot. On this issue the deficiency is approved. III. The third issue is in effect disposed of by the foregoing. Petitioner's obligation to make payment to its pension trust was, as our findings show, limited retroactively to 15 per cent of the compensation paid to employees in the taxable year - not the calendar year. On the disposition we have made of the first point, the compensation paid by petitioner in each taxable year does not exceed an amount of which 15 per cent was the deduction permitted in the deficiency notice. See . IV *303 and XII. For similar reasons we find it unnecessary to pass upon the arguments advanced by petitioners Roland H. Neel and Joseph N. Neel and their respective wives, that they are entitled to the benefits of section 107 in connection with the so-called "back-pay" awards. Having found that these were not compensation but in the nature of a distribution of corporate profits, there is nothing in that section which can be made applicable to their situation. XI and XIII. Petitioners Roland H. Neel and Joseph N. Neel and their respective wives contend that if the so-called back-pay was not compensation, but instead was a distribution by the corporation, it is at least in part non-taxable because it constitutes a return of capital, the corporation's accumulated earnings being insufficient to cover the payments. Not only does the evidence fail to support that proposition, but such information as we have indicates the contrary. At the beginning of the period, as we have found, the corporation's surplus earned subsequent to March 1, 1913, was over $85,000 according to its books. Apparently the corporation had net income in both of the fiscal years in issue since income taxes were paid for both *304 periods. This was after deducting as salary the payments we have found to have been distributions. Their disallowance as deductions by the corporation necessarily increases current earnings correspondingly so that an exactly equivalent amount was added to the existing earned surplus and there was hence available for taxable distributions at least the amount of the disallowed salary items. In this respect the determination has every appearance of being correct. II. The next question is whether additional amounts of $5,000 for each year should be allowed as deductions to petitioner corporation for accounting fees. Although the time for payment was indefinite the testimony shows that the obligation to pay was fixed both as to liability and amount in the year in question, the agreement being "to pay * * * at the rate of $10,000 a year." The difference between that figure and the $5,000 allowed for each year should have been permitted as a deduction. See . V. Petitioner Joseph N. Neel ascribes error to the determination on the ground of a failure to allow depreciation claimed on the property listed in our findings. There is no evidence from which we *305 can conclude that respondent's action was erroneous. For all that appears, his contention that the basis of the depreciable property has been used up is correct and since the burden rested upon petitioners, the determination must be sustained in this respect. VI. The evidence indicates that the real property on which petitioner Joseph N. Neel claims an ordinary loss on sale was devoted to rental purposes. It was obviously business property, and although the evidence is meager as to what income was received, our conclusion is that the property was used in petitioners' trade or business, so as to constitute the result of the sale a loss under sections 23 (e) and 117 (j). Cf. . VII and VIII. On these issues the problem is to determine the gain of petitioner Joseph N. Neel on the sale of two blocks of stock of Jos. N. Neel Co. in the respective amounts of 50 and 146 shares; and this in turn, since the selling price is not questioned, requires a determination of petitioner's basis for the respective blocks. Respondent made his determination on the theory that the basis to be attributed was the March 1, 1913, value of the stock. Although petitioner contends otherwise, *306 his own exhibit, said to be based on a "Fifo method for basis of stock," gives figures as set out in our findings which are in virtual accordance with the fair market value per books of $69.49 on the March 1, 1913 date - a figure now apparently accepted by both parties. [1] We accordingly conclude that respondent's determination is substantially correct, but should be reduced by allowing the difference between the March 1, 1913 value used by him of $67.84 a share and the higher figure just mentioned. X. The only apparent reason for respondent's disallowance of a capital loss carry-over claimed in 1945 by Joseph N. Neel and his wife is that a portion of the carry-over loss which petitioners deducted had been used up in 1944. The proper capital loss carry-over may now be determined in light of our treatment of questions VI and VII. IX. Petitioner Joseph N. Neel contends that he turned in for redemption bonds of Jos. N. Neel Investment Corp. which were purchased as a part of a larger block *307 of securities, and that the entire purchase price must be recovered before any gain is realized. This is clearly erroneous under the principle that the basis of the property is to be allocated where possible and the gain determined upon the sale of a part by using as its cost the allocable portion of the whole. . There is no showing that allocation is not practicable, and in fact it appears simple. The basis to be attributed to the property sold is hence the appropriate proportion of the total cost, which petitioner has not shown, but which presumably is the same as the amount determined by respondent. We find no error in the deficiency in this respect. XIV. Although the evidence is not as convincing as it might have been, we think that some of the expenditure claimed by petitioners Roland Neel and his wife for traveling and entertainment has been adequately shown. We are not satisfied, however, that as large an amount as that deducted is actually attributable to business expense and the evidence on that point is of the usual general and indefinite character. Applying the well recognized rule, we conclude that petitioners are entitled to the deduction *308 of $600 for this item out of the $900 claimed. . Decisions will be entered under Rule 50. Footnotes
***. 6 months. ↩
*. Died. ↩
**. In Army. ↩
*. Hired 6-15-35.↩
1. We do not overlook petitioner's contention that March 1, 1913 good will value should be added, but even if that were so, there is no material in the record from which such a figure could be computed.↩